IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **THE TRAVELERS LLOYDS** | § | |
| **INSURANCE COMPANY, as Real** | § | |
| **Party in Interest and Subrogee of** | § | |
| **MANNATECH, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:12-CV-3635-L** |
| | § | |
| **ALL-GLASS AQUARIUM CO., INC.,** | § | |
| | § | |
| Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| **DALLAS NORTH AQUARIUM,** | § | |
| | § | |
| Third-Party Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant All-Glass's Motion for Summary Judgment (Doc. 22), filed

September 16, 2013.  After careful consideration of the motion, response, briefs, evidence, record,

and applicable law, the court **grants** Defendant All-Glass's Motion for Summary Judgment (Doc.

22).

**I.      Procedural and Factual Background**

On September 6, 2012, Plaintiff The Travelers Lloyds Insurance Company ("Plaintiff" or

"Travelers"), as the real party in interest and subrogee of insured Mannatech, Inc. ("Mannatech")

brought this products liability case against All-Glass Aquarium, Co. Inc. ("Defendant" or "All-

Glass") asserting claims based on strict liability and negligence.  Travelers seeks subrogation

damages in the amount of $371,434.28 that it paid to its insured Mannatech for property loss sustained to Mannatech's commercial business place.  Travelers also seeks costs of court and prejudgment and postjudgment interest.  Travelers contends that Mannatech's place of business was damaged when an allegedly defective aquarium fluorescent light component ("AFLC")[1] manufactured by All-Glass caught fire on May 14, 2011.  With regard to strict liability, Travelers asserts that there were defects in the design, manufacturing, and marketing of All-Glass's AFLC.  In support of its products liability claim based on negligence, Travelers alleges that All-Glass failed to use ordinary care with respect to the design, manufacturing, and marketing of the AFLC.

All-Glass filed its Original Answer on October 14, 2012, denying Travelers's substantive allegations.  All-Glass also asserts affirmative defenses, contending that Travelers is contributorily negligent for failing to properly maintain the premises and AFLC.  All-Glass alleges in the alternative that it is not liable to Travelers because the alleged damages: (1) were caused by the negligent acts of third parties over which All-Glass had no control; (2) were caused by an unvoidable accident; or (3) resulted from Mannatech failing to use ordinary care in reducing, avoiding, or mitigating the alleged damages.  On May 16, 2013, All-Glass filed its Third Party Complaint against Dallas North Aquarium Service, Inc. ("Dallas North Aquarium").  Dallas North Aquarium has not entered an appearance in the action, and there is no indication from the docket that service of process

---

[1] Throughout its summary judgment response and brief, Travelers uses the term "Fluorescent Light" or "Product" when referring to the "fluorescent aquarium light reflector product" at issue.  Pl.'s Resp. 1; Pl.'s Br. 1.  By this, Travelers appears to refer to the housing for the fluorescent lights that sat on top of the aquarium, not the actual fluorescent lights themselves.  Defendant, on the other hand, simply uses the term "fish tank light" to refer to the product at issue.  Regardless of the terminology used, the court's discussion in this opinion focuses on whether the "fluorescent aquarium light reflector product," not the individual fluorescent lights that were housed in the "fluorescent aquarium light reflector product," were defectively designed, manufactured, or marketed. For purposes of consistency and to avoid confusion, the court refers to the "fluorescent aquarium light reflector product" or component of the aquarium as "AFLC."

**Memorandum Opinion and Order – Page 2**

has been effected as to Dallas North Aquarium. Further, there has been no request for entry of default and motion for default judgment against Dallas North Aquarium.  For these reasons, the court determines that Dallas North Aquarium has not been served, that it lacks personal jurisdiction over Dallas North Aquarium, and that it will dismiss the third-party complaint against Dallas North Aquarium for lack of personal jurisdiction.

On September 16, 2013, All-Glass moved for summary judgment on Travelers's claims, contending that Travelers has "no evidence" to support the elements of any of its claims based on manufacturing defects, design defects, marketing defects, and negligence.  All-Glass asserts that, while circumstantial evidence may be used to establish any fact material to a products liability claim, Travelers's evidence of the single fire that occurred on May 14, 2011, is legally insufficient to survive summary judgment because proof of a product failure alone is insufficient under Texas law. According to All-Glass, Travelers must also eliminate the existence of other possible causes of the incident by showing that other possible causes are impossible or improbable.[2]  With regard to Travelers's products liability claim based on negligence, All-Glass states: "Whereas strict products liability focuses on whether the product was sold in a defective condition unreasonably dangerous to the user, negligence focuses on the supplier's standard of care . . . [and] the acts of the manufacturer and asks whether it exercised ordinary care in design and production."  Def.'s Br. 7.

---

[2] All-Glass also contends that section 82.008(a) of the Texas Civil Practices and Remedies Code creates a rebuttable presumption for defendant manufacturers and sellers that no liability exists for a product's formulation, labeling, or design "when the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government or a federal agency that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm." Def.'s Br. 5. All-Glass, however, does not explain why it believes that it is entitled to this rebuttable presumption; nor does it refer the court to any evidence supporting application of the presumption in this case. The court therefore does not address it.

All-Glass contends that Travelers has no evidence that it failed to comply with its duties of ordinary care in designing, manufacturing, or marketing the fish tank light.

In response to the summary judgment motion,[3] Travelers concedes that it does not have sufficient summary judgment evidence to establish a genuine dispute of material fact that the AFLC manufactured by All-Glass was defectively designed or marketed.  Travelers therefore agrees that All-Glass is entitled to judgment on these claims.  Travelers nevertheless contends that there is sufficient evidence to raise a genuine dispute of material fact as to whether the AFLC was defectively manufactured.  In this regard, Travelers contends that there is a genuine dispute of material fact whether, on May 14, 2011, the AFLC manufactured by All-Glass "was defective or unreasonably dangerous; that such condition existed when it left [All-Glass]; and that the [AFLC] was the cause of the fire and [P]laintiff's damages."  Pl.'s Br. 34.  Travelers also requests the opportunity to present oral argument regarding its response to the summary judgment motion.  With respect to its negligence claim, or what it refers to as its "negligent manufacturing claim," Travelers "concedes that . . . [it] is subsumed within its defective product theories.  *Id.* 32.

All-Glass did not file a reply in support of its summary judgment motion and therefore appears not to dispute the factual matters upon which Travelers relies.  The court will therefore consider these factual matters to be undisputed and true *as long as they are supported by the record and competent summary judgment evidence*.  Applying the applicable summary judgment standard, the court concludes, for reasons herein explained, that Travelers's evidence is insufficient to raise

---

[3] The summary judgment response brief filed by Travelers is thirty-five pages in length but does not contain the requisite table of contents or table of authorities, thus making it cumbersome and difficult to follow.  L.R. 7.2(d) (requiring table of contents and authorities for briefs in excess of 10 pages); L.R. 56.5(b) ("The requirements of LR 7.2 apply to briefs filed pursuant to LR 56.5(a).").

a genuine dispute of material fact with respect to any of the elements of its manufacturing defect claim, the only claim remaining after Travelers's aforementioned concessions. All-Glass is therefore entitled to judgment on all of Travelers's claims.

## II.      Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)

(emphasis in original).  "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Id.* (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.  *Ragas*, 136 F.3d at 458.  Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.*  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

## III.    Undisputed Facts

On May 14, 2011, a fire occurred at the office space leased by Mannatech at 600 Royal Lane, Suite 200, Coppell, Texas, in the vicinity of where a fresh water fish aquarium was located. Mannatech's office space and the aquarium were damaged in the immediate vicinity of the fire.  The

aquarium and AFLC were both manufactured by All-Glass or by Aqueon, a company purchased by All-Glass.  When an aquarium of the kind at issue is  purchased or sold as new, the aquarium, glass, lid, and light are all included in one unit.

In response to All-Glass's summary judgment motion, Travelers presented evidence in the form of expert testimony.[4]  As previously noted, All-Glass did not file a reply or attempt to refute this evidence by Travelers.  It is therefore undisputed.  Travelers's expert, Richard Taylor ("Taylor"), conducted an investigation and concluded that the May 2011 fire originated in the AFLC, which he referred to as the "top plastic cover to the aquarium housing the fluorescent light fixture."  Pl.'s App. 24.  Taylor ruled out the following as causes of the fire: smoking, weather related conditions, and incendiary action.  *Id.* 25.

Travelers's other expert, Dean Bolt ("Bolt") similarly concluded, based on the fire and burn damage patterns on the wall behind the aquarium, that the fire started "at the top of the aquarium tank."  *Id.* at 40.  Bolt also concluded that the fire resulted from a malfunction in the AFLC that sat on top of the aquarium.  Bolt was unable to pinpoint with certainty the exact initial source of the fire due to the severity of the damages to the AFLC or aquarium light fixture housing, wiring, and the reflector area.  He nevertheless concluded, without explanation, that "absent a product defect, a fire should not occur within an aquarium light."[5]  *Id.* 44.

---

[4] Travelers submitted two expert's reports, which were incorporated by reference into the affidavits of the experts.

[5] Bolt's statement, that "absent a product defect, a fire should not occur within an aquarium light," is an unsupported conclusory assertion and therefore is inadmissible and not competent summary judgment evidence.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012) (quoting and applying reasoning in *General Elec. Company v. Joiner*); *Forsyth*, 19 F.3d at 1533 (unsubstantiated assertions, improbable inferences, and unsupported speculation are

Bolt noted that the aquarium contained multiple "potential" ignition sources but expressed the opinion that the ignition source for the May 14, 2011 fire was an electrical failure within one of the fluorescent lights that sat on top of the aquarium.  Bolt ruled out improper installation as the cause of the fire based on his determination that the light at issue was installed in accordance with All-Glass's instructions.  In Bolt's opinion, the initial failure or malfunction in the light fixture that occurred was "most likely" due to "a bad connection at one of the tombstones contacts," which "potentially allowed moisture intrusion into the contact connection resulting in a heated connection which would have heated the surrounding plastic material and ultimately ignited it." *Id.*  In addition, Bolt expressed the opinion that "manufacturer[s] should anticipate the potential for the intrusion of moisture" inside an AFLC or aquarium light fixture because:

> With all aquariums, the humidity above the water surface would generally be higher than the rest of the room where the tank is located. This is especially true when there is a canopy over the tank as there was with this aquarium. Even with the glass cover between the tank and the lights, there would be infiltration of warm moist air up into the canopy space where the lights were located. Because of this potential, an aquarium light needs to be able to operate in a moist environment. Despite guidelines which direct consumers to avoid getting water into the lights, the manufacturer should anticipate the potential for the intrusion of moisture which cannot be controlled by the owner, such as condensation inside the light from this moist air.

*Id.* 44.

The Mannatech employees with the most knowledge concerning the May 14, 2011 fire and history of the aquarium and AFLC are Mannatech, Inc. vice president Bill Lacava ("Lacava") and Mannatech facilities manager John Rhodes ("Rhodes").  Rhodes has been employed by Mannatech

not competent summary judgment evidence).

for 16 years.  Rhodes was not involved in Mannatech's acquisition of the aquarium but testified that he thought the aquarium was "donated" as a "gift" to Mannatech in 2006 by two real estate brokers with whom Mannatech was doing business at the time.  *Id.* 94.

Lacava joined Mannatech in 2009, after Mannatech acquired the aquarium.  Lacava similarly testified that Mannatech acquired the aquarium after renewing the lease for its office space in Coppell, and that the real estate brokers who negotiated the lease "purchased" or gave the aquarium to Mannatech as gift.  *Id.* 70-71.   Lacava's "understanding" of how the aquarium came to be at Mannatech was based on what Mannatech's facilities department and the two real estate brokers, who negotiated the lease, told him.

Rhodes testified that the aquarium was originally placed in Mannatech's human resources department, but it was moved to Mannatech's lobby in approximately 2010 because employees did not like the fish smell.  The aquarium was moved to the lobby and reinstalled by Dallas North Aquarium.  Rhodes and Lacava were not aware of any issues with the aquarium that required service or repair other than routine maintenance and cleaning prior to the fire on May 14, 2011. Rhodes testified that Dallas North Aquarium installed and serviced the aquarium, and that no other company had maintained, repaired, or serviced the aquarium.  Lacava, on the other hand, testified in his deposition and states in an affidavit that Aquarium Environment did the original installation and serviced the aquarium until 2007 or 2008, and after that time, Dallas North Aquarium was hired to service the aquarium for maintenance purposes.  Lacava did not know why Mannatech changed servicers because this decision occurred before he was hired by Mannatech.

Dallas North Aquarium owner John Holcomb ("Holcomb") was deposed and testified that the only change that Dallas North Aquarium made to the AFLC was to replace two fluorescent lights on April 17, 2009. Holcomb further testified that Dallas North Aquarium only stocked lights manufactured by Coralife, a subdivision of All-Glass, and that the replacement fluorescent light bulbs installed in 2009 by Dallas North Aquarium were Coralife bulbs. According to Holcomb's testimony and Dallas North Aquarium's records, maintenance of the aquarium by Dallas North Aquarium frequently involved "half" or "full" services. *Id.* 137-41. In a half-serve or service, water is added, but the aquarium lid is not removed. In a full-serve or service, the aquarium lid is removed to remove and replace 25 to 30 gallons of water in the tank. A half-service was performed by Dallas North Aquarium on May 6, 2011, ten days before the fire, and a full-service of the aquarium was performed on April 21, 2011, less than one month before the fire. Prior to the fire, Mannatech had not experienced any issues with the electrical outlet to the aquarium or the circuit breakers for this electrical outlet. On the morning of the fire, Mannatech's lobby doors were locked, and no one entered the lobby before the fire.

Following the fire, Lacava reviewed Mannatech's maintenance records for the aquarium. Mannatech's records include copies of invoices prepared by Aquarium Environment for the period of December 29, 2007, to July 31, 2008, and copies of invoices prepared by Dallas North Aquarium for the period of September 5, 2008, to May 6, 2011. Mannatech also maintained a spreadsheet or "electronic accounting register" ("ACR") for the period between April 29, 2007, to May 6, 2011, which includes the following information for each invoice: invoice date, invoice number, amount of invoice, supplier or servicer's name, supplier number, payment number, and payment date. According to the ACR printout and an affidavit by Lacava, Mannatech received and paid Aquarium

Environment for invoices for the period of April 29, 2007, to November 29, 2009, but copies of these invoices were not retained by Mannatech.  As a result, the information in the ACR regarding these invoices is the only evidence of the invoice contents.  Lacava states in his affidavit, based on information in the ACR, that all of the Aquarium Environment invoices, including the missing invoices, are for the same amount — $167.32.  Lacava also notes, with respect to the Aquarium Environment invoices retained by Mannatech, that the invoice amount of $167.32, was for "Freshwater 175g Service."[6]  Pl.'s App. 191.  In support of its summary judgment response, Travelers did not present any records (or other evidence) regarding the service and maintenance for the aquarium for the period between 2006, when the aquarium was donated to Mannatech, and March 2007, before Aquarium Environment began servicing the aquarium.  As a result, the only evidence of who originally installed the aquarium at Mannatech's offices is Rhodes's and Lacava's conflicting testimony.

## IV.    Analysis

As previously noted, Travelers concedes that it does not have sufficient evidence that the AFLC was marketed or designed in a defective manner and that All-Glass is entitled to judgment

---

[6] The ACR printout and the invoices retained by Mannatech are attached to Lacava's affidavit; however, the ACR printout and invoices and Lacava's affidavit statements regarding the contents of the ACR and missing and retained invoices are hearsay, that is, Travelers relies on this evidence and the statements in Lacava's affidavit to show not only that the aquarium was serviced or maintained by Aquarium Environment and Dallas North Aquarium from April 2007 to May 2011, but also to show, based on the contents of the ACR and invoices that there were no issues or repairs, other than normal maintenance, to the aquarium and AFLC.  Thus, they are offered for the truth of the matter asserted and are hearsay, and Travelers does not attempt to show that these records fall within the business records exception.  Even if Travelers could show that the ACR and invoices themselves fall within the business records exception to hearsay, it would still need to show that the contents of these records are nonhearsay or fall within an exception because the source of the information in the records, other than the payment numbers and payment dates, is an outsider, that is, Aquarium Environment or Dallas North Aquarium.  *Alzuraqi v. Group 1 Automotive, Inc.*, 921 F. Supp. 2d 648, 671 (N.D. Tex. 2013).  Regardless of whether the court considers this evidence, All-Glass is entitled to judgment on Travelers's products liability claims for the reasons herein explained.

**Memorandum Opinion and Order – Page 11**

on its marketing and design defect claims. Further, although the requirements for negligent manufacturing claims and manufacturing defect claims, based on strict liability, are different, Travelers concedes in its response that its negligent manufacturing claim is "subsumed" in its strict liability manufacturing defect claim.   Pl.'s Br. 32.   Based on this acknowledgment and because Travelers only addresses the elements and evidence supporting its strict liability manufacturing defect claim, the court concludes that this is the only claim it is pursuing.   Accordingly, Defendant is entitled to judgment on Travelers's strict liability and negligence claims that are based on marketing and design defects, as well as Travelers's negligent manufacturing claim; and the court only considers whether a genuine dispute of material fact exists as to Travelers's strict liability claim based on alleged manufacturing defects.

### A.       Manufacturing Defects Based on Strict Liability and Negligence Theories

"A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 540 (Tex. 2011) (internal quotation marks omitted). To establish a strict liability manufacturing defect claim under Texas law, a plaintiff must prove that: (1) "the product was defective when it left the manufacturer"; (2) "the defect was a producing cause of the plaintiff's injuries"; and (3) the product deviates from the manufacturer's specifications or planned output in a manner that renders the product unreasonably dangerous. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 41-43 (Tex. 2007). A producing cause is a cause that was "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Ledesma*, 242 S.W.3d at 42. Evidence of a product failure or malfunction, standing alone, is insufficient to establish a product defect; instead, "a specific defect must be identified by competent evidence and

other possible causes must be ruled out." *Id*. at 42. Thus, "[t]he inference of defect may not be drawn . . . from the mere fact of a product-related accident" because "[t]he mere fact that the [product] failed would amount to evidence of a manufacturing defect so slight as to make any inference a guess [and] is in legal effect no evidence." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 807 (Tex. 2006).

"[R]equiring a deviation from specifications or planned output permits a jury to determine whether a specific defect caused the accident, rather than premising liability on a belief that a product failure, standing alone, is enough to find a product defect." *Ledesma*, 242 S.W.3d at 42. "The requirement of a deviation from the manufacturer's specifications or planned output [also] serves the essential purpose of distinguishing a manufacturing defect from a design defect." *Id.* Direct and circumstantial evidence may be used to establish that the manufacturing defect existed at the time of sale or distribution. *Cooper Tire & Rubber Co.*, 204 S.W.3d at 807; *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). When, however, the record contains no proof of the product's defect other than the malfunction itself, "and the product ha[s] been in use for years and subjected to many adjustments and changes, the cause of the product failure and proof of original defect [cannot] not be answered except by speculation." *Id.* 807-08 (internal quotation marks omitted). Consequently, "[t]he age and use of that product during the time intervening between the purchase and malfunction will tend to support or defeat the circumstantial weight of the malfunction as proof of original defect." *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 350 (Tex. 1977), *overruled in part on other grounds by Turner v. General Motors Corp.*, 584 S.W.2d 844, 851 (Tex. 1979)).

All-Glass contends that Travelers has no evidence and cannot satisfy any of the requirements for a strict liability manufacturing defect claim. Def.'s Br. 5-6. Travelers disagrees and asserts that

"there is sufficient evidence to establish a genuine issue of material fact that the [AFLC] was defective when it left the hands of the defendant All-Glass and that the defect was a producing cause of the May 14, 2011 fire at the Mannatech premises." Pl.'s Br. 25. Travelers contends that "reasonable fact-finders could differ in their conclusions as to whether Defendant's [AFLC] was defective and that the defect probably existed at the time it left the manufacturer." *Id.* 31.

To establish the existence of a manufacturing defect, Travelers relies on Taylor's and Bolt's expert opinions that the fire started at the top of the aquarium tank. Travelers also relies on Bolt's opinion that the fire was caused by internal electrical failures in one of the fluorescent lights and "fluorescent lights do not ordinarily catch fire absent a product defect."[7] *Id.* 30. Travelers asserts, based on Bolt's testimony, that the light's "internal electrical failures confirm the light malfunctioned and was a competent ignition source" for the fire. *Id.* 28. Travelers contends that Bolt's conclusion in this regard is bolstered by the fact that he eliminated all other sources of ignition. Travelers further asserts that Taylor's report and Rhodes's testimony, that Mannatech's lobby was locked and secured at the time of the fire, and that no employees had entered the lobby the morning of the fire, eliminated any likelihood that the fire could have resulted from incendiary action or smoking.

In addition, Travelers maintains that the following evidence supports the conclusion or inference that the AFLC "was defective and that the defect probably existed at the time it left the manufacturer claim":

> Witness testimony (John Rhodes and Bill Lacava of Mannatech, Inc. and John Holcomb of Dallas North Aquarium) establish that the aquarium and the [AFLC] was manufactured by defendant; purchased new; and installed at Mannatech. Defendant's

---

[7] This quote is Travelers's summary of Bolt's opinion that "absent a product defect, a fire should not occur within an aquarium light." Pl.'s App. 44.

[AFLC] was properly used on a freshwater aquarium and sat atop a glass partition in compliance with defendant's installation instructions. On May 14, 2011, the aquarium was located in the associate lobby of Mannatech. From its installation until the fire on May 14, 2011, there were no issues with the aquarium generally, and the defendant's [AFLC] specifically. No one with Mannatech modified or altered defendant's [AFLC]. No one with Mannatech reported any issues, or requested any repairs or service to the defendant's [AFLC]. The maintenance and service records for the aquarium, including the [AFLC], from April 29, 2007 through May 14, 2011, indicate that nothing more than routine maintenance and cleanings were performed. The only known service performed on defendant's [AFLC] was the replacement of [f]luorescent bulbs, with replacement All-Glass fluorescent bulbs on April 17, 2009, approximately two years before the fire. The last cleaning service performed by Dallas North Aquarium before the fire was on May 6, 2011, and did not require defendant's [AFLC] to be moved. On the morning of the fire, the associate lobby doors were locked and no one entered the lobby before the fire. Before the fire, Mannatech experienced no issues with the operation of the electrical outlet serving the aquarium and aquarium components, including the [AFLC], nor any issues with the circuit breakers associated with this electrical outlet.

*Id.* 29-30.

With respect to circumstantial evidence, Travelers contends that when a plaintiff "has no evidence of a specific defect in the design or manufacture of the product, he may offer evidence of its malfunction as circumstantial proof of the product's defect." *Id.* at 21 (quoting *Hopkins*, 548 S.W.2d at 349-50). Travelers, however, acknowledges that evidence of a malfunction alone is insufficient to establish that a product is defective. Pl.'s Br. 22. The parties disagree whether Travelers is required under Texas law to eliminate all other possible causes of the product related incident to establish its strict liability manufacturing defect claim.

Regardless of whether Travelers is required to eliminate all other possible causes of the product related incident, the court concludes that its evidence is at most only evidence of a product failure or malfunction and is insufficient to raise a genuine dispute of fact as to whether the AFLC was defective, and, in particular, whether it was defective when it left All-Glass's control. Like the

plaintiffs in *Cooper Tire*, a manufacturing defect case involving a tire failure, Travelers here relies on expert evidence in an attempt to eliminate other causes of the product failure. In *Cooper Tire*, however, the court explained that such evidence is insufficient to establish a manufacturing defect because "even if plaintiffs had eliminated every conceivable reason for the tire failure other than a product defect existing when the tire left Cooper Tire's plant, *they did not eliminate the possibility of a design defect*." *Cooper Tire & Rubber Co.*, 204 S.W.3d at 807 (emphasis added). Neither of Travelers's experts eliminates the possibility of a design defect.[8]

Moreover, Bolt's expert report suggests the contrary – that the fire resulted from a defect in the design of the AFLC. As previously noted, Bolt states in his report that manufacturers should anticipate that an aquarium light needs to be able to operate in a moist environment because of the potential in all aquarium tanks, and in particular those with canopies like Mannatech's aquarium, for moisture to intrude in the form of condensation above the water surface. Pl.'s App. 44. According to Bolt, "[e]ven with the glass cover between the tank and the lights, there would be infiltration of warm moist air up into the canopy space where the lights were located." *Id.* While Bolt uses the term "product defect" in the next paragraph of his report wherein he states that "absent a product defect, a fire should not occur within an aquarium light," his opinion in this regard is entirely

_____

[8] Travelers attempts to eliminate other possible causes of the fire based on evidence that there were no reported issues with or repairs to the aquarium or AFLC, and service was limited to maintenance and one repair in 2009 that involved the replacement of two fluorescent lights by Dallas North Aquarium. Travelers also relies on evidence that the last service performed by Dallas North Aquarium ten days before the fire was a "half service" and therefore did not involve the removal of the aquarium top or AFLC. Travelers, however, overlooks the "full service" performed on April 21, 2011, less than a month before the fire, in which the aquarium top was removed according to Holcomb. Travelers also does not address the lack of evidence, in the form of service records or otherwise, regarding the service and maintenance, if any, that was done to the aquarium from 2006, when the aquarium was installed at Mannatech, to March 2007. Additionally, Bolt does not mention or appear to account for the replacement of the two fluorescent lights in 2009 and instead states in his report: "The light was installed according to the instructions provided by All Glass and was not modified or serviced after being installed based on records provided by Dallas North Aquarium." Pl.'s App. 44. In the final analysis, the age of the AFLC at the time of the fire and Travelers's failure to eliminate the possibility of a design defect in the AFLC is fatal to its manufacturing defect claim.

**Memorandum Opinion and Order – Page 16**

conclusory, as he does not explain the basis for the opinion. Additionally, based on the placement of the statement in Bolt's report, it is clear that it was made in conjunction with his opinion regarding aquarium design considerations.

Further, while Travelers is correct that the age and use of the AFLC are relevant, the court disagrees that Travelers's evidence of the AFLC's age and use supports its position that the product was defective, or that it was defective when it left All-Glass's control. Travelers contends, based on *Shaun T. Mian Corporation v. Hewlett-Packard Company*, 237 S.W.3d 851 (Tex. App.—Dallas, pet. denied), a case involving a printer/fax machine that caught fire, that it is entitled to an inference that the AFLC was not only defective but also defective when it left the manufacturer. According to Travelers, this inference is proper because, like *Shaun T. Corporation*, there is evidence in this case that the AFLC was "purchased new" and the AFLC was not damaged, modified, or repaired (other than normal maintenance) in the five years before the fire.

For support that the aquarium and AFLC were "purchased new," Travelers points to Rhodes's and Lacava's testimony. Pl.'s Br. 3, 24, 29. Travelers also asserts that the inference is warranted because: no one at Mannatech modified or altered the AFLC after it was installed; Rhodes and Lacava were not aware of any issues with or repairs to the AFLC, other than normal maintenance; the only known service that was performed involved the replacement of the fluorescent light bulbs with All-Glass light bulbs in April 2009; and the last cleaning performed by Dallas North Aquarium before the fire did not require the removal of the Fluorescent Light Component that sat on top of the aquarium.

Travelers's reliance on *Shaun T. Corporation* is misplaced. First, there is evidence that the aquarium, which came with the AFLC, was purchased or donated to Mannatech in 2006. There is

**Memorandum Opinion and Order – Page 17**

no evidence, however, that the aquarium was "purchased new," and Lacava's and Rhodes's testimony that the aquarium was purchased or donated does not support the inference that it was "purchased new." For example, evidence that a person purchased an automobile does not necessarily support the inference that the automobile was "purchased new" as opposed to "used." Likewise, evidence that an item was donated does necessarily support the inference that the item was new when it was donated.

Here, Lacava and Rhodes, who are the Mannatech employees with the "most knowledge" regarding the aquarium, admittedly have little or no knowledge of the aquarium's history *before* it was donated to Mannatech in 2006. Pl.'s Resp. 1. Absent evidence of when the aquarium was purchased by the real estate brokers and from whom it was purchased, it is equally likely that the aquarium was purchased "used" or secondhand. Even assuming that it was "purchased new," it could have been installed and in use at the real estate brokers' office for sometime before being donated to Mannatech in 2006.

Setting aside the issue of whether the aquarium and AFLC were purchased new, Travelers misunderstands the significance of the age of the product at the time of the fire. In *Shaun T. Mian Corporation*, there was evidence that the printer/fax machine was purchased new, arrived in a sealed box without any visible damage, *and was only two months old when it caught fire*. *Shaun T. Mian Corp.*, 237 S.W.3d at 855-56, 864. With respect to "[n]ew or nearly new products," the court explained that such products "typically have not been modified or repaired, therefore making a product defect the likely cause of an accident. Thus, an inference of original product defect may be warranted from the malfunction of a relatively new or sealed product." *Shaun T. Mian Corp.*, 237 S.W.3d at 863 (internal quotations and citations omitted). The court's conclusion regarding the

treatment in manufacturing defect cases of "[n]ew or nearly new products" was based on the Texas

Supreme Court's reasoning in *Ridgway*, 135 S.W.3d at 601, and *Darryl v. Ford Motor Company*,

440 S.W.2d 630 (Tex. 1969).  In *Shaun T. Mian Corporation*, the court aptly summarized the

*Ridgway* case and opinion as follows:

>    *Ridgway* involved a products liability claim against a pick-up truck
> manufacturer for damages resulting when the vehicle caught fire while being driven.
> The Ridgways, plaintiffs in the case, were the third owners of the pick-up. The
> pick-up's first owner drove it for approximately 7,000 miles and installed a spotlight
> in the front left door frame. The second owner drove the pick-up approximately
> 47,000 more miles and had it repaired four times in an effort to fix a "clunking noise"
> that occurred during hard turns. Three of these repairs also involved the fuel system
> in an attempt to increase the pick-up's mileage. The Ridgways drove the pick-up for
> one month and made no repairs or modifications before it caught fire. *Ridgway*, 135
> S.W.3d at 599.
>
>    In response to the manufacturer's motion for summary judgment, the
> Ridgways presented evidence that the fire occurred and an affidavit from an expert
> stating he suspected the fire was caused by the electrical system. However, the expert
> declined to eliminate all portions of the fuel system as a possible cause of the
> accident, conceding "the actual cause of the fire has not been determine [sic] yet." *Id.*
> at 600.
>
>    The supreme court held that [there was no direct evidence of the fire's cause,
> and] the Ridgways' circumstantial evidence was no more than a scintilla of evidence
> as to the existence of a defect in the pick-up at the time it left the manufacturer. *Id.*
> at 602. In doing so, the court declined to decide whether Texas law was reflected in
> section 3 of the Restatement (Third) of Torts [as argued by the plaintiffs], stating that
> if such an inference of product defect can be made, "it would generally apply only to
> new or almost new products. Such products typically have not been modified or
> repaired, therefore making a product defect the likely cause of an accident." *Id.* at
> 601.

 *Shaun T. Mian Corp.*, 237 S.W.3d at 859 (footnote regarding section 3 of the Restatement (Third)

of Torts [9] omitted).  Although not addressed in *Shaun T. Mian Corporation*, the court in *Ridgway*

---

[9] Section 3 of the Third Restatement of Torts addresses the role that circumstantial evidence plays in supporting
an inference of a product defect. Section 3 provides:

also cited several cases that are referenced in the reporters' notes to Section 3 of the Third

Restatement of Torts Restatement as examples of "when a product defect cannot be inferred without

proof of a specific defect because of the product's age or the presence of modifications or repairs."

Examples of cases in which the existence of a product defect could not be inferred included those

involving a freezer cord that functioned flawlessly for eight years before catching fire and a

six-year-old toaster oven that caught fire.  *Id.*  On the other hand, the inference of a product defect

was warranted in cases in which: (1) a boat broke in half after only ten hours of use; (2) a six-day-old

vehicle did not perform as intended; (3) a five-week-old chair collapsed.  *Id.*

Here, Travelers acknowledges that the aquarium and AFLC had been in use at Mannatech's

office for at least five years before the fire in 2011.  Thus, unlike the product in *Shaun T.*

*Corporation*, the aquarium and AFLC were not new or nearly new when the fire occurred.

Moreover, according to the examples of cases in *Ridgway* of when a product defect can and cannot

be inferred, Travelers is not entitled to an inference that the AFLC was defective at the time it left

All-Glass's control, even though there is evidence that the AFLC functioned without any significant

issues for five years before the fire.  *See id.* (citing *Woodin v. J.C. Penney Co.*, 427 Pa. Super. 488,

629 A.2d 974, 976-77 (1993)), for the proposition that "a product defect cannot be inferred in a

---

**§ 3 Circumstantial Evidence Supporting Inference of Product Defect**

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of the kind that ordinarily occurs as a result of a product defect; and

(b) was not, in the particular case, solely the result of causes other than the product defect existing at the time of sale or distribution.

Restatement (Third) of Torts: Products Liability § 3 (1998).

**Memorandum Opinion and Order – Page 20**

freezer cord when it functioned flawlessly for eight years before catching fire"; and *Walker v. General Elec. Co.*, 968 F.2d 116, 120 (1st Cir. 1992), for the proposition that "the mere fact that a six-year-old toaster oven caught fire does not support an inference that a manufacturing defect exists.").

Finally, while Defendant asserts, based on *Ridgway*, and Travelers acknowledges that: "A manufacturing defect exists 'when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous,'"[10] there is no evidence that the AFLC deviates from the manufacturer's specifications or planned output in a manner that renders it unreasonably dangerous.[11]  *Ledesma*, 242 S.W.3d at 41-43); *Ridgway*, 135 S.W.3d at 600.  There is no indication from the reports of Travelers's experts that the manufacturer's specifications or planned output for the AFLC was even considered as part of their investigations. Although Bolt expressed the opinion that "absent a product defect, a fire should not occur within an aquarium light," without any evidence that the AFLC deviates from the manufacturer's specifications or planned output, it may be that All-Glass did exactly what it intended to do with respect to

---

[10] Pl.'s Resp. 21 (quoting *Ridgway*, 135 S.W.3d at 600); Def.'s Br. 4-5 (quoting *Ridgway* for the same proposition).

[11] Because of the way in which All-Glass's motion is written, it is not entirely clear whether All-Glass contends that there is no evidence of this particular element.  With regard to Travelers's strict products liability claim based on alleged manufacturing defects, All-Glass asserts that "[p]roducts liability imposes strict liability on the manufacturer of an unreasonably dangerous product that is a producing cause of a plaintiff's injuries," and [t]he plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries." Def.'s Br. 5.  All-Glass goes on to state: "A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *Id.* (internal quotation marks omitted). *Id.* 5-6. All-Glass then states that it is entitled to judgment on Travelers's manufacturing defect claim because "Travelers has no evidence that Defendant's product failed to comply with the above requirements." *Id.* 6.  From this, it appears to the court that All-Glass contends that Travelers had no evidence to support any of the elements of a manufacturing defect claim, including the requirement that the product must deviate from the manufacturer's specifications or planned output.  Even if All-Glass did not intend to move for summary judgment on the ground that there is no evidence that the AFLC deviates from its specifications or planned output in a manner that renders it unreasonably dangerous, All-Glass is still entitled to judgment on Travelers's manufacturing defect claim for the other reasons discussed.

manufacturing the AFLC.  If so, the AFLC may be the result of a design defect rather than a manufacturing defect. *See Ledesma*, 242 S.W.3d at 42 (explaining that "[t]he requirement of a deviation from the manufacturer's specifications or planned output serves the essential purpose of distinguishing a manufacturing defect from a design defect."); *Cooper Tire & Rubber Co.*, 204 S.W.3d at 808 (noting, with respect to causation, that the plaintiff's expert had not eliminated the possibility of a design defect).  Accordingly, Travelers's evidence is insufficient to raise a genuine dispute as to any of the elements of a manufacturing defect claim.

### B.      Travelers's Request for Oral Argument

The court generally decides motions based on the parties' briefs and does not grant requests for oral argument unless they are necessary to clarify issues of concern to the court.  Having determined that Travelers's evidence is insufficient to raise a genuine dispute of material fact as to any of its claims, the court determines that a hearing regarding the summary judgment motion is unnecessary.  The court therefore **denies** Travelers's request for a hearing to present oral argument.

### V.     Conclusion

For the reasons explained, the court concludes that no genuine dispute of material fact exists with regard to any of the claims asserted by Travelers against All-Glass in this case.  Accordingly, the court **grants** Defendant All-Glass's Motion for Summary Judgment (Doc. 22) and **dismisses with prejudice** this action and all claims asserted against All-Glass.  Further, for the reasons previously stated, the court lacks personal jurisdiction over Dallas North Aquarium and **dismisses without prejudice** this action against it.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the court will issue a judgment by separate document.

**It is so ordered** this 17th day of January, 2014.

Sam A. Lindsay
United States District Judge